UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROSTAR WIRELESS GROUP, LLC, | Case No. 3:16-cv-05399-WHO |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| DOMINO'S PIZZA, INC., | Re: Dkt. Nos. 70, 71, 76, 78, 79, 83 |
| Defendant. | |

## INTRODUCTION

Plaintiff Prostar Wireless Group, LLC ("Prostar") seeks to hold Domino's Pizza[1] ("Domino's") accountable for the years of work it spent developing a custom GPS driver tracking system ("the Solution") for Domino's franchisees. Prostar argues that despite a lengthy collaboration, Domino's refused to honor its side of the deal and allow Prostar to sell the finished Solution to franchisees. Instead, it relied on Prostar's work to develop an in-house system. Before me is Domino's motion for summary judgment on all ten causes of action. For the reasons set forth below, Domino's motion is GRANTED.

## BACKGROUND

### I. FACTUAL BACKGROUND

#### A. Prostar's Early Work on Driver Tracking

Prostar is a wireless services group that provides standard communication options as well as custom designed software and dynamic product development. First Amended Complaint

---

[1] Prostar filed the complaint against Domino's Pizza, Inc., but counsel for Domino's asserted at the hearing on this motion that Domino's Pizza LLC, which performs franchisor duties, is the entity with whom Prostar collaborated throughout the relationship.

("FAC") [Dkt. No. 29] ¶¶ 11–13. Domino's is a pizza company with approximately 6,000 domestic and 8,000 to 9,000 international stores. Deposition of Dennis Maloney ("Maloney Depo.") [Dkt. No. 72-9] 75:20–76:12. The corporation owns about 400 domestic stores; the rest are franchises. *Id.* 107:3–13.

By 2007, Prostar was working to develop a driver tracking Solution to allow pizza companies to better manage delivery. Declaration of Joe Olsen ("Olsen Decl.") [Dkt. No. 77-57] ¶ 2. The Solution was not customer-facing but rather aimed at improving the efficiency of store operations. Pierson Decl. Ex. 16 [Dkt. No. 72-16], 5[2] (GPS Delivery Tracking information sheet); *see* Olsen Depo. 137:9–15 (noting that Prostar did no more than discuss a customer-facing product). In September 2007, Prostar presented an early version of its product at a Domino's Franchisee Association ("DFA") convention in Orlando, Florida and received feedback from potential franchisee customers. Olsen Decl. ¶ 2. Prostar attended additional DFA and Domino's World Wide Rally conventions in 2008, 2009, and 2010 "to market its Solution and get feedback from franchisees." *Id.* Through these efforts, it developed relationships with dozens of franchisees. *Id.* After continued development, Prostar completed and tested a prototype of the product in early 2009. *Id.*

**B.** **Collaboration Between Prostar, Domino's, and IBM**

In December 2010, Prostar, Domino's, and IBM[3] met to discuss GPS driver tracking for Domino's.[4] Pierson Decl. Ex. 18 (meeting invite sent by Jim Maertens of IBM); *see* Olsen Decl. ¶ 3 (noting that his focus beginning in late 2010 was on developing a customized driver tracking Solution for Domino's). The product Prostar planned to develop would be integrated with

---

[2] ECF page numbers will be used for exhibits.

[3] IBM became involved as Domino's "integrator and provider of store-based projects" because it had information and contacts that would allow it to reach to Domino's franchisees. Deposition of James Maertens ("Maertens Depo.") [Dkt. No. 72-6] 62:6–63:4; *see* Deposition of Anthony Minniti ("Minniti Depo.") [Dkt. No. 72-10] 24:2–9. "Prostar was instructed by Domino's to work with IBM." Olsen Decl. ¶ 6.

[4] Prostar asserts that the three companies met again in January 2011, but the exhibits it cites do not reference such a meeting. *See* Oppo. 3. Nash Decl. Ex. 11 [Dkt. No. 76-9], Ex. 41 [Dkt. No. 76-34].

Domino's "Pulse" point-of-sale software system[5] and be "released to Domino's franchisees across the United States and through much of the rest of the world." Olsen Decl. ¶ 3. Todd Bohlen, a Domino's engineer, then become involved with the goal of developing within Pulse the ability to communicate with Prostar's GPS Solution through application program interfaces ("APIs"). Bohlen Depo. 46:23–47:9. APIs are "a technical contract [through which] the two systems agree on how they are going to talk to each other." *Id.* 47:2–5. The parties did not share source code, but they did share other technical specifications. Olsen Decl. ¶ 11.

Joe Olsen, who at various points has been a Prostar software developer, chief technology officer, consultant, and shareholder, continued to work toward a GPS Solution with Bohlen, Domino's executives, and Domino's IT personnel. *See* Olsen Decl. ¶¶ 3–5; Olsen Depo. 38:10–14, 41:16–19; Nash Decl. Ex. 42 [Dkt. No. 76-35] (emails between Bohlen and Chris Demery, also of Domino's, about the Prostar Solution pilot). Olsen also worked with IBM personnel, and he "understood . . . that IBM had a close relationship with all Domino's franchisees as well as Domino's largest and most influential franchisees." Olsen Decl. ¶¶ 4–5. Olsen explained the plan moving forward as follows:

> So the terms were that we, [Domino's] and Prostar, develop and integrate a full Solution with parameters . . . that would be integrated into Pulse, that IBM would do the sales and the marketing of the product to franchises, and that once that was completed . . . we, being IBM, Prostar and Domino's, would sell driver tracking to individual franchises all across the -- across the spectrum of Domino's franchises.

Olsen Depo. 108:23–109:12; *see id.* 872:18–873:14 (testifying IBM would be responsible for selling Prostar's Solution).

By March 2011, Prostar had become one of IBM's approved vendors. Olsen Decl. ¶ 6. On March 11, 2011, Prostar and IBM entered into a Software and Services Engagement Agreement. Nash Decl. Ex. 4 [Dkt. No. 77-5] (agreement). Prostar did not enter into a contract with Domino's because "all the agreements were through IBM." Olsen Depo. 143:8–12. During this time, Olsen and other individuals from Prostar were in regular contact with IBM and with Domino's

---

[5] Although franchisees can generally choose their own technology, most are required to use Pulse. Minniti Depo. 25:17–23.

executives and IT personnel.  Olsen Decl. ¶ 7.

### C.    Development, Testing, and Equivocation

Between 2011 and 2013, Prostar "devoted thousands of hours to custom software development work and related activities." *Id.* ¶ 8.  Olsen did this work under the belief that "if [Prostar and IBM's] joint effort proved fruitful in developing and integrating the Prostar solution into the Pulse system, the solution would be made available to Domino's franchisees" for a monthly fee.  *Id.*

In May 2012, a Domino's employee indicated to Olsen that it was "fully committed" to the Solution.[6]  Olsen Decl. ¶ 10 (internal quotation marks omitted).  Another time, Domino's expressed excitement and "full support" for it.  Deposition of Michael Nelson ("Nelson Depo.") [Dkt. No. 77-14] 311:8–19.

In September 2012, Domino's let Prostar and IBM know it could not make a commitment to the Solution.[7]  Pierson Decl. Ex. 25 (emails between Olsen of Prostar, Jim Maertens of IBM, and Bohlen and Wayne Pederson of Domino's).  Olsen responded, "We understand – it is difficult to commit while we are both still working on the integrating/software."  *Id.*

During one system-wide Pulse update in May 2013, Domino's released the product functionality as a pilot.  Bohlen Depo. 84:6–85:10.  At that point, Domino's could flip a switch and the APIs would be enabled for a store to use the Solution.  *Id.* 83:19–84:5.

Over time, Prostar tested various versions of the Solution at Domino's franchisee locations.  *Id.* ¶ 9.  In all, it tested the Solution at approximately 15 locations.  Pierson Decl. Ex. 35 (Prostar Response to Interrogatory No. 18) [Dkt. No. 72-35].  Some franchisees were unwilling to pay for the pilot and were permitted to test it for free.  Pierson Decl. Ex. 34 (email from Olsen to Matthew Walls of Domino's) [Dkt. No. 72-34].

In July 2013, IBM proposed a Project Change Request ("PCR") to Domino's.  Pierson

---

[6] The amended complaint's earliest facts about the implied in fact contract date back to 2012.  *See* FAC ¶ 128.

[7] Domino's made this statement in response to a request from IBM and Prostar that it make a purchase related to the Solution.  Pierson Decl. Ex. 25.

Decl. Ex. 26 (emails from Maertens of IBM to Walls of Domino's) [Dkt. No. 72-26].  Domino's refused to sign the PCR.  Pierson Decl. Ex. 27 (email from Walls to Maertens) [Dkt. No. 72-27]. Domino's wrote that they had previously discussed an agreement between the franchisees and IBM/Prostar, and Domino's "completely disagree[d]" with the idea of taking ownership over the Solution by signing a contract.  *Id.*

**D.      Domino's Refuses to Allow Prostar and IBM to Sell the Solution to Franchisees**

In February 2014, Olsen attended a meeting at Domino's headquarters in Ann Arbor, Michigan.  Olsen Decl. ¶ 21.  He learned that Domino's wanted to make changes to the Solution, including making it customer-facing and available for use on Android phones and iPhones.  *Id.* ¶ 22.  Olsen began to implement that work and provided Domino's weekly updates.  *Id.*

In October 2014, Olsen reached out to Domino's because the Sprint device that Prostar had used to develop the Solution was no longer being manufactured.  Pierson Decl. Ex. 36 (email from Olsen to Michael Davis of Domino's).  Domino's responded that until it finished reviewing the technology, the Solution would "be in a holding pattern from a [Domino's] perspective."  *Id.*

The Solution was ready for use on smart phones by May 2015.  Olsen Decl. ¶ 22.  At that same time, Domino's learned that Pizza Hut was developing a customer-facing GPS system. Pierson Decl. Ex. 42 (internal Domino's presentation on Pizza Hut's announcement that it would create a GPS delivery tracker).  In July 2015, a Domino's employee visited a store that was testing Prostar's Solution, spoke with Olsen, and then invited him to Ann Arbor.  Deposition of Dennis Maloney ("Maloney Depo.") 289:11–290:17, 283:16–18, 297:22–298:2.  Prior to that meeting, the parties entered into a nondisclosure agreement ("NDA") that stated they were discussing "a possible business relationship."  Pierson Decl. Ex. 44 (NDA).

At a July 30, 2015 meeting in Ann Abor, Olsen learned that Domino's was working to develop its own driver tracking system.  *Id.* ¶ 26.  Domino's nonetheless asked Prostar to create a rollout plan for the Solution, which it did.  *Id.*  On August 31, 2015, Domino's told Prostar that it would not be using Prostar's Solution.  *Id.*

## II.     PROCEDURAL HISTORY

Prostar filed its initial complaint in San Mateo Superior Court on August 8, 2016, and Domino's removed it to this court on September 21, 2016.  Dkt. Nos. 1, 1-1.

On January 6, 2017, I granted Domino's motion to dismiss the complaint because Prostar had not adequately alleged the elements of the causes of action it asserted.  Order Granting Motion to Dismiss ("Order") [Dkt. No. 25].  The breach of fiduciary duty claim failed because Prostar did not adequately plead sharing of profits and losses as required to show a joint venture.  *Id.* 7.  "While I [could] reasonably infer that potential profits from increased efficiency and customer satisfaction may be derivative of the Solution, this [was] not synonymous with an agreement to share *joint* profits."  *Id.*  The implied-in-fact contract claim failed because there were no plausible allegations showing Domino's intent to promise to sell the fully developed Solution.  *Id.* 8.  The breach of covenant of good faith and fair dealing claim failed because there were no remaining contract claims.  *Id.* 9.  The tortious interference with prospective economic advantage claims failed because the allegations were "insufficient to rise to the level of an 'existing relationship'" with the franchisees.  *Id.* 10.  The unfair competition claim failed because it was based on a common law claim, which was insufficient to show unlawfulness under the UCL.  *Id.* 10–11.  Finally, the misappropriation of trade secrets claim failed because Prostar failed to adequately allege that it took reasonable efforts to maintain the secrecy of the trade secrets it asserted.  *Id.* 12.

I granted Prostar leave to amend, and it filed an amended complaint on January 26, 2017.  First Amended Complaint ("FAC") [Dkt. No. 29].  The amended complaint alleges ten causes of action against Domino's:  (1) breach of fiduciary duty, FAC ¶¶ 73–90; (2) intentional interference with prospective economic relations, *id.* ¶¶ 105–17; (3) negligent interference with prospective economic relations, *id.* ¶¶ 118–25; (4) misappropriation of trade secrets (Civil Code § 3426 et seq.) *id.* ¶¶ 98–105; (5) breach of implied in fact contract, *id.* ¶¶ 126–46; (6) breach of the covenant of good faith and fair dealing, *id.* ¶¶ 147–53; (7) deceit, *id.* ¶¶ 154–69; (8) negligent misrepresentation, *id.* ¶¶ 170–82; (9) promissory estoppel, *id.* ¶¶ 183–87; and (10) unfair competition under California Business and Professions Code § 17200, *et. seq.*, *id.* ¶¶ 188–93.

Domino's answered the amended complaint on February 23, 2017.  Dkt. No. 32.  The

parties proceeded to discovery, and Domino's filed the pending motion for summary judgment on October 29, 2018.  Motion for Summary Judgment ("MSJ") [Dkt. No. 71].  I heard argument on the motion on December 19, 2018.

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

## I.  WHETHER PROSTAR'S NON-CONTRACT CLAIMS ARE PREEMPTED

Domino's argues that it is entitled to summary judgment on claims one (breach of fiduciary duty), two (intentional interference with prospective economic relations), three (negligent interference with prospective economic relations), seven (intentional misrepresentation), eight (negligent misrepresentation), nine (promissory estoppel), and ten (unfair competition) because they are preempted by CUTSA.  MSJ 8.  With the exception of contractual claims, CUTSA "preempts common law claims that are based on the same nucleus of facts as the

misappropriation of trade secrets claim for relief." *Peralta v. California Franchise Tax Bd.*, 124 F. Supp. 3d 993, 1002 (N.D. Cal. 2015), *aff'd,* 673 F. App'x 975 (Fed. Cir. 2016) (internal quotation marks and citation omitted); *see* CAL. CIV. CODE § 3426.7. To survive preemption, Prostar's claims must "allege wrongdoing that is materially distinct from the wrongdoing alleged in a CUTSA claim." *SunPower Corp. v. SolarCity Corp.*, No. 12-CV-00694-LHK, 2012 WL 6160472, at *9 (N.D. Cal. Dec. 11, 2012).

Domino's argues that "[a]s alleged, core to each claim is that Domino's used Prostar's driver tracking technology, supplanting Prostar's chance to sell to franchisees." MSJ 8. Prostar counters that its common law claims survive because they are based on a different nucleus of facts. Opposition ("Oppo.") [Dkt. No. 76-4] 27. I conclude that only Prostar's claim for breach of fiduciary duty rests on a materially distinct set of facts; the remaining claims are preempted.

### A. Fiduciary Duty

Domino's argues that Prostar's breach of fiduciary duty claim relies on the same facts as its claims under CUTSA. Reply 18. Domino's relies on a case in which the court decided to strike the complaint's partnership allegations, which the plaintiff had newly alleged in an amended complaint after the court dismissed the first set of allegations as preempted. *GeoData Sys. Mgmt., Inc. v. Am. Pac. Plastic Fabricators, Inc.*, No. CV1504125VAPJEMX, 2016 WL 6601656, at *8 (C.D. Cal. July 25, 2016). Although the plaintiff had avoided mentioning its trade secrets in the newly alleged claim, the CUTSA allegations "still form[ed] the crux" of it. *Id.* By contrast, Prostar's fiduciary duty claim rests on "materially distinct" factual allegations pertaining to a surviving joint partnership claim. *See SunPower*, 2012 WL 6160472, at *9. Specifically, it alleges that "Domino's usurped the corporate opportunity" of the parties' joint venture, thus breaching its fiduciary duty to Prostar. This wrongdoing is materially distint from any claims that Domino's also engaged in trade secret misappropriation. Oppo. 27. This claim is not preempted.

### B. Deceit and Negligent Misrepresentation

Prostar argues that these claims are not preempted because "Domino's committed fraud to gain Prostar's labor and insight for free" whether or not Domino's also misappropriated its trade secrets. Oppo. 28. In one case, a court in this district found that a fraud claim was preempted in

spite of plaintiffs' allegations that the defendants had fraudulently induced their resources and time rather than their intellectual property. *Farhang v. Indian Inst. of Tech., Kharagpur*, No. C-08-02658 RMW, 2010 WL 2228936, at *12 (N.D. Cal. June 1, 2010). The court concluded that "the crux of plaintiffs' claim [was] their allegation that defendants used plaintiffs' resources and time to develop applications derived from plaintiffs' IP for their own benefit." *Id.* Prostar makes similar allegations of "labor and insight," but as Domino's points out, "[t]he fruit of that labor and insight are the trade secrets" that were allegedly misappropriated. Reply 18. These claims cannot escape preemption.

### C. Tortious Interference with Prospective Economic Relations and Unfair Competition

Prostar's tortious interference and unfair competition claims depend on its fraud claims. *See* FAC ¶¶ 101, 114, 189. Because its fraud claims are preempted, summary judgment is also appropriate on these claims.

### D. Promissory Estoppel

Domino's asserts that Prostar's promissory estoppel claim rests on its contention that Domino's "made a promise in service of stealing Prostar's technology." Reply 18. Prostar did not oppose Domino's motion for summary judgment on preemption grounds. Accordingly, I will grant it.

Domino's motion for summary judgment on the deceit and negligent misrepresentation claims is GRANTED because those claims are preempted. Its motion is GRANTED with respect to the tortious interference and unfair competition claims because those claims depend on their fraud allegations. Domino's motion for summary judgment on the promissory estoppel claim is GRANTED because Prostar failed to oppose the motion. Domino's motion for summary judgment of the fiduciary duty claims on the basis of preemption is DENIED.

## II. WHETHER DOMINO'S IS ENTITLED TO SUMMARY JUDGMENT

Domino's argues that notwithstanding preemption, it is entitled to summary judgment on the merits of all ten causes of action. Although I have already concluded that five of Prostar's claims are preempted, I will nonetheless address the entirety of Domino's motion on the merits. I

9

conclude that summary judgment is appropriate because Prostar has failed to raise triable issues.

**A. Fiduciary Duty**

"The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (1995). Prostar's breach of fiduciary duty claim turns on the existence of a joint venture agreement, because "a joint venturer owes fiduciary duties to his coventurers." *Galardi v. State Bar*, 43 Cal. 3d 683, 691 (1987).

"The essential element of a joint venture is an undertaking by two or more persons to carry out a single business enterprise jointly for profit." *Pellegrini v. Weiss*, 165 Cal. App. 4th 515, 525 (2008). "A joint venture agreement may be informal or oral," *id.*, but "[i]t requires an agreement under which the parties have (1) a joint interest in a common business, (2) an understanding that profits and losses will be shared, and (3) a right to joint control." *Ramirez v. Long Beach Unified Sch. Dist.*, 105 Cal. App. 4th 182 (2002). Although "the agreement is not invalid because it may be indefinite with respect to its details," *Lasry v. Lederman*, 147 Cal. App. 2d 480, 487 (1957), "[a] legally binding agreement . . . is not formed where essential elements are reserved for future agreement." *Goodworth Holdings Inc. v. Suh*, 239 F. Supp. 2d 947, 956 (N.D. Cal. 2002) (Alsup, J.), *aff'd*, 99 F. App'x 806 (9th Cir. 2004).

There is no evidence that Prostar and Domino's expressly agreed (either orally or in writing) to begin a joint venture. Instead, Prostar argues that the parties' conduct supports a conclusion that there was a joint venture because "the parties here worked in concert for years" to develop the GPS Solution, and both contributed to its costs and had a stake in its success. Oppo. 18. Domino's argues that there is no evidence to support a finding that the parties (1) agreed to share profits, and (2) had a right to joint control. MSJ 9–10.

Prostar has failed to present sufficient evidence to create a triable issue that Domino's owed it a fiduciary duty because a reasonable fact finder could not conclude that the parties came to an agreement to share profits or that they exercised joint control.

**1. Profit Sharing**

Domino's argues that there is no evidence that the parties agreed to share profits. At most,

Prostar contemplated paying Domino's a flat fee for providing product support for the Solution through Pulse-Care, its preexisting support system. MSJ 21–22. Prostar counters that the parties collaborated to develop a single service, and neither would be successful unless the Solution was successful. Oppo. 17–18. The parties "understood that profits and losses would be shared," and more specificity is not required. Oppo. 17.

Joint venturers must agree to share in the actual profits and losses of their venture. *Connor v. Great W. Sav. & Loan Ass'n*, 69 Cal. 2d 850, 863 (1968). *But see Simmons v. Ware*, 213 Cal. App. 4th 1035, 1054 (noting that "there is some authority to the effect that the sharing of losses is not necessary" to create a joint venture). Where one party stands to gain whether or not the venture is profitable, for example through payment of a flat fee, no joint venture is created. *Fuls v. Shastina Properties, Inc.*, 448 F. Supp. 983, 990 (N.D. Cal. 1978). In addition, when both parties' success depends on the venture's success but each one stands to gain or lose irrespective of the other, no joint venture is created. *Connor*, 69 Cal. 2d at 863.

In *Connor*, the California Supreme Court held that a joint venture did not exist because although the parties cooperated, shared control, and anticipated profits, "neither was to share in the profits or the losses that the other might realize or suffer." *Connor v. Great W. Sav. & Loan Ass'n*, 69 Cal. 2d 850, 863 (1968). The homes plaintiffs had purchased in a residential development suffered damage because of poorly designed foundations. *Id.* at 856. Plaintiffs sought to hold the savings and loan association liable on the theory that it was in a joint venture with the company that negligently built the homes. *Id.* at 856–57. There was insufficient evidence to support an inference of a joint venture because each party had a unique role in the project. *Id.* at 863. While the profits each stood to gain would depend on the development's success, "neither had an interest in the payments received by the other." *Id.*

A court in this district granted summary judgment where there was insufficient evidence of a joint venture between parties who instead reached an "agreement to agree." *Goodworth Holdings*, 239 F. Supp. 2d at 957. Although the parties had spoken many times about a deal and even agreed to some terms, other essential terms were undecided. *Id.* "Their preliminary agreements were mere preliminary negotiations that may or may not have wound up leading to a

11

final offer." *Id.* The court further noted that the parties had eventually signed a term sheet with provisions that were "inconsistent with the notion that the parties had already bound themselves to each other in a joint venture." *Id.* at 958.

There is insufficient evidence of profit sharing to create a triable issue. Although joint venturers need not iron out all the details of their venture, here the parties failed to agree on essential elements, like the structure of their potential financial relationship, even after years of discussions and collaboration. *See Goodworth*, 239 F. Supp. 2d at 956. The discussions they did have were no more than preliminary negotiations that barely touched on terms. In my prior Order dismissing Prostar's complaint, I rejected its arguments that a joint venture was created based on Domino's potential to profit in the form of increased sales and efficiency. Order 7. Instead, I agreed with Domino's that "true joint venturers must agree to share in the actual profits and losses of the joint venture itself." *Id.* Prostar argues only that "the parties contemplated that Domino's would provide first-level technical support to franchisees through its Pulse help desk and would be compensated for this service." Oppo. 17. Viewing the evidence in the light most favorable to Prostar, the parties agreed that they might later agree to some sort of financial arrangement, perhaps in the form of a flat fee.[8] This evidence is insufficient for a verdict in favor of Prostar.

### 2. Joint Control

Domino's argues that a fact finder could not conclude there was a joint venture because "[t]here is no evidence that Domino's and Prostar had the right to control each other's businesses, operations, or employees with respect to driver tracking." MSJ 10. In addition, five years after the joint venture was supposedly formed, Prostar signed a contract saying the parties were independent contractors who had no authority to bind one another. *Id.* Prostar counters that there is a great deal of evidence that Domino's had control over how it developed the Solution. Oppo. 18–19. The parties were in frequent communication during which Domino's demanded particular features and modifications to the Solution and approved other changes. *Id.*

"An essential element of a joint venture is the right of joint participation in the

---

[8] Prostar does not challenge Domino's argument that the arrangement contemplated involved a flat fee or that a flat fee would be insufficient.

management and control of the business." *Gradus v. Hanson Aviation, Inc.*, 158 Cal. App. 3d 1038, 1057–58 (1984). Joint venturers "must each have an ownership interest in the enterprise." *Orosco v. Sun-Diamond Corp.*, 51 Cal. App. 4th 1659, 1666 (1997).

In one case, a California court of appeal concluded that a joint venture did not exist because only one party had control over the production of the product. *Orosco v. Sun-Diamond Corp.*, 51 Cal. App. 4th 1659, 1666 (1997). There was no evidence that the party in control would have to answer to the other party even for a decision as important as completely withholding the product from the market. *Id.*

A reasonable fact finder could not conclude that the parties exercised joint control over the Solution. Prostar had control over the Solution, and as the intended customer, Domino's requested desired features, approved changes, and generally communicated with Prostar frequently. But none of that shows that Domino's exercised *control* over the Solution or had any ability to hold Prostar to actually implementing those changes. At the extreme, if Prostar had decided to completely scrap its development efforts, it would not have had to answer to Domino's. *See Orosco*, 51 Cal. App. 4th at 1666 (noting that one party could have completely stopped production without needing to answer to the other party).

Prostar and Domino's both expressed an interest in the Solution and believed they stood to benefit from its success. They engaged in frequent conversations and collaborated to that end. But without evidence of joint control or an agreement to share profits, this conduct does not transform their efforts into a joint venture. Domino's motion for summary judgment on the breach of fiduciary duty claim is GRANTED.

### B. Implied In Fact Contract

The elements for a breach of an implied in fact contract are: "(1) the existence of the contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the defendant; and (4) damages." *Rubio v. U.S. Bank N.A.*, No. C 13-05752 LB, 2014 WL 1318631, at *10 (N.D. Cal. Apr. 1, 2014) (citation omitted). "An implied contract is one, the existence and terms of which are manifested by conduct." Cal. Civ. Code § 1621. "[A] contract implied in fact consists of obligations arising from a mutual agreement and intent to promise where the agreement

13

and promise have not been expressed in words." *Retired Employees Assn. of Orange Cty., Inc. v. Cty. of Orange*, 52 Cal. 4th 1171, 1178 (2011) (internal quotation marks and citation omitted).

Prostar argues that the evidence of the parties' conduct shows that as of June 13, 2012, there was an implied agreement that if Prostar developed the Solution to Domino's satisfaction, Domino's would purchase it. Oppo. 10; *see* FAC ¶ 133. Domino's challenges the sufficiency of Prostar's evidence of such an agreement on three grounds: the later-executed NDA precludes a finding of an implied agreement, there is no evidence of Domino's intent to agree, and any promise Domino's purportedly made is too vague to be enforceable. I will grant Domino's motion for summary judgment because the NDA, which is unambiguous and which embraces the same subject matter, precludes the implied agreement that Prostar asserts. Even if the NDA did not preclude such a finding, there is insufficient evidence of intent, and any agreement is too vague to be enforceable.

### 1. The Unambiguous NDA Precludes an Implied Agreement

Domino's argues that the 2015 NDA between the parties precludes a finding that there was an implied-in-fact contract. MSJ 11. In opposition, Prostar does not dispute that the NDA covers the same subject matter as the supposed implied-in-fact contract—namely, the relationship between the parties[9] in the context of developing the Solution. Rather, it argues that the NDA has no effect because the implied agreement between the parties predated it. Oppo. 13–14.

"A valid express agreement precludes a contradictory implied contract embracing the same subject matter." *Baker v. Kaiser Aluminum & Chem. Corp.*, 608 F. Supp. 1315, 1320 (N.D. Cal. 1984). In *Dore*, the California Supreme Court affirmed the trial court's ruling that an express written contract controlled in the face of an earlier implied agreement. *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391–92, 139 P.3d 56, 60 (2006). The court had no need to rely on extrinsic evidence of an implied agreement because the written agreement was unambiguous. *Id.*

The parties' NDA precludes a finding that Domino's had impliedly agreed to purchase the

_____

[9] Prostar asserted at the hearing that it sues a different entity (Domino's Pizza, Inc.) than the entity that signed the NDA (Domino's Pizza LLC). Domino's represented that despite this discrepancy, at all times Prostar worked with Domino's Pizza LLC. Prostar offered no evidence to suggest otherwise.

Solution from Prostar upon its satisfactory development. The NDA describes itself as existing "[i]n connection with business discussions and a possible business relationship relating to the purchase of products or services ('Product') by Domino's from Vendor." Pierson Decl. Ex. 44 (NDA). Prostar does not challenge the NDA on the grounds that it is ambiguous or embraces distinct subject matter. Indeed, it is unambiguous and embraces the same subject matter, the relationship between Prostar and Domino's vis-à-vis Prostar's work on the Solution, as the purported implied agreement. Accordingly, as of late 2015, the parties had merely agreed that Domino's *might* select Prostar as a vendor (through a contract with IBM). The NDA's language precludes the contradictory implied agreement that Prostar asserts. *See Baker*, 608 F. Supp. at 1320.

## 2. There Is Insufficient Evidence of Intent

Domino's argues that there is no evidence that it intended to make a promise to Prostar in 2012. MSJ 12. Instead, evidence that Domino's expressly declined to enter into an agreement regarding the Solution would preclude a reasonable fact finder from determining that the parties reached a contrary implied agreement. *Id.* Prostar responds that an implied agreement is apparent from evidence including Domino's express assurances, the parties' conduct, Domino's request for modified performance in 2014, and Domino's search for a contract in 2015. Oppo. 10–13.

"California courts follow the objective theory of mutual assent under which the terms of a contract are established, not by the undisclosed intention of the promisor, but by such words or conduct as justify the promisee in understanding that the promisor intended to make a promise." *People v. Randono*, 32 Cal. App. 3d 164, 175 (1973). Where a party has expressly declined to enter into an agreement, courts are unwilling to conclude that the party impliedly did so. *See Rochlis v. Walt Disney Co.*, 19 Cal. App. 4th 201, 211 (1993), as modified (Oct. 6, 1993), and *disapproved of on other grounds by Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238 (1994).

There is insufficient evidence that Domino's intended to enter into an implied agreement with Prostar. The statements and conduct Prostar puts forth express Domino's sincere interest in the Solution and a future desire to make it available to franchisees, but these are insufficient to show Domino's had the present intent to make a promise. In addition, Prostar acknowledges that

IBM and Domino's "had a long-established practice" of signing PCR agreements for new projects. Domino's express refusal to sign a July 2013 PCR related to the Solution would prevent a reasonable jury from finding intent. *See* Oppo. 12 n. 3. Neither the 2014 changes Domino's requested nor the 2015 efforts to secure a written contract can overcome the absence of an objective manifestation of mutual assent.

### 3. Any Agreement Was Too Vague To Be Enforceable

Domino's argues that any agreement from 2012 is too indeterminate to form the basis for a breach of contract claim because the parties had not agreed to specific features or test results the pilot would have to produce in order to make the Solution satisfactory to Domino's. MSJ 13–14. Prostar asserts that the terms in its Statement of Work with IBM and in the 2013 PCR provide a "clear range of values from which damages can be calculated." Oppo. 11–12.

"To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." *Ladas v. California State Auto. Assn.*, 19 Cal. App. 4th 761, 770 (1993). A promise is too amorphous to rise to the level of a contractual duty when it provides no standard by which a fact finder could decide on whether the parties met their obligations. *Id.* at 771.

I agree with Domino's that any agreement the parties could be found to have reached would be too vague to provide a basis for its enforcement. It is not clear what features the Solution needed to have to meet Domino's requirements, nor is it clear what test results the parties hoped would come out of the Solution's pilot. Even accepting the premise that Domino's promised to allow Prostar to sell the Solution when it was "ready," a fact finder would have no way of assessing such readiness.

For all of these reasons, Domino's motion for summary judgment on the breach of implied contract claim is GRANTED.

### C. Breach of Covenant of Good Faith and Fair Dealing

Domino's is entitled to summary judgment on Prostar's claim for breach of the covenant of good faith and fair dealing because there is no triable issue on Prostar's contract claims. *See Zody*

16

*v. Microsoft Corp.*, No. 12-CV-00942-YGR, 2012 WL 1747844, at *4 (N.D. Cal. May 16, 2012) ("Thus, because the Court holds that the breach of contract claim must be dismissed, the implied covenant claim must follow suit."). Its motion is GRANTED on this claim.

### D.    Misappropriation of Trade Secrets

Domino's argues that it is entitled to summary judgment on Prostar's misappropriation of trade secrets claim for three reasons. First, all of the asserted trade secrets were generally known. Second, some of the trade secrets were never actually shared with Domino's. Finally, Prostar failed to keep some trade secrets a secret. MSJ 15–19.

### 1.    Whether Prostar's Trade Secrets Were Generally Known

Domino's asserts that Prostar failed to present evidence that its trade secrets were not generally known in 2015 when Domino's allegedly misappropriated them. Prostar counters that its driver tracking system was not generally known because it was specifically tailored to the pizza-delivery context and designed to integrate with Domino's Pulse system. Oppo. 25.

A trade secret is information that derives value "from not being generally known to the public or to other persons who can obtain economic value from its closure or use." *See* Cal. Civ. Code § 3426.1(d)(1). If information is publicly available or widely known in a given industry, it is not a trade secret. *Walker v. Univ. Books, Inc.*, 602 F.2d 859, 865 (9th Cir. 1979). The burden is on the plaintiff to establish that the information it asserts is indeed a trade secret. *See Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 465–66 (9th Cir. 1990); (affirming summary judgment where the information was a "matter of common public knowledge"); *Am. Student Fin. Grp., Inc. v. Aequitas Capital Mgmt., Inc.*, No. 12-CV-2446, 2015 WL 11237638, at *9 (S.D. Cal. Feb. 12, 2015) (granting summary judgment because the trade secret descriptions were too vague to allow the fact finder to determine it was "not generally known to the relevant public").

Prostar has failed to meet its burden to create a triable issue. Prostar argues that it "created a comprehensive system to work for a target market with a very specific set of business parameters and operating challenges" and that its system "function[s] in complete integration with the existing point of sale system used by that target market." Oppo. 25. Put more simply, Prostar developed a

GPS tracker specifically for pizza delivery and integrated it with the preexisting Pulse system. It asserts that "[t]here is no evidence in the record of anything in the market truly comparable." Oppo. 26. But the burden is on Prostar to make a showing that its Solution was not widely known by 2015, by which time GPS systems were common, including in the pizza delivery space. *See* Pierson Decl. Ex. 42 (internal Domino's presentation on Pizza Hut's announcement that it would create a GPS delivery tracker). *See Integral Sys., Inc. v. Peoplesoft, Inc.*, No. C90-2598-DLJ, 1991 WL 498874, at *14 (N.D. Cal. July 19, 1991) (declining to issue a preliminary injunction where other products were "parallel . . . in both form and features").

Without evidence that would allow a fact finder to conclude that its trade secrets are in fact trade secrets, Prostar's claims cannot proceed to a jury. Even if Prostar could present such evidence, summary judgment would be appropriate on the grounds discussed below.

### 2. Whether There Is Evidence That Prostar Shared Trade Secrets 2, 4, 5, 6, 7, 8, 9, And 10 With Domino's

A plaintiff asserting a misappropriation of trade secrets claim must present evidence that the defendant had access to its trade secrets. *Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 56 (2014).

Seven of the trade secrets Prostar alleges (numbers 2 and 4–10) are algorithms that support features of the Solution it developed. *See* Pierson Decl. Ex. 53 (Prostar's trade secret disclosure). Domino's argues that these trade secrets cannot form the basis for Prostar's misappropriation claim because Prostar never shared them with Domino's. MSJ 16. Prostar counters that Olsen would testify at trial that the algorithms were "discernible" from technical information supplied to Domino's via email and as a result, this question should be left to a jury. Oppo. 26. In its reply, Domino's points out that Prostar has offered neither Olsen nor anyone else as an expert to offer such an opinion. Reply 14.

Prostar presents insufficient evidence to create a triable issue on its claims for trade secrets 2 and 4–10. Olsen's declaration states generally that he gave Domino's IT "information sufficient to describe Prostar's algorithms." Olsen Decl. ¶ 11. But Prostar has not presented Olsen as a technical expert who can opine on whether the algorithms were discernible from the information

18

provided in the emails, and such an opinion would certainly require "scientific, technical, or other specialized knowledge" within the meaning of Federal Rule of Evidence 702.[10]  *See* FED. R. EVID. 702; *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990) ("[A] mere promise to produce admissible evidence at trial does not suffice to thwart summary judgment.").  Finally, as Domino's points out, Olsen's own deposition testimony undermines that assertion.  Reply 15. When asked, "Did you actually furnish the Prostar developed algorithms to Domino's?" Olsen responded, "Well, that would be in the code, right? That, we wouldn't do."  Olsen Depo. 62:10–13.  Domino's is entitled to summary judgment on the claim for misappropriation of trade secret numbers 2 and 4–10.

### 3.    Whether Prostar Shared Trade Secret Number 3

Domino's argues that Prostar's claim on trade secret number 3 fails because Prostar never disclosed the "complex system for receipt and immediate processing" of data that it claims. Instead, the parties merely exchanged APIs, which Prostar does not claim as trade secrets.  Prostar failed to oppose these arguments.  Domino's is entitled to summary judgment on the claim for misappropriation of trade secret number 3.

### 4.    Whether Prostar Protected Trade Secret Number 1

A plaintiff bringing a misappropriation of trade secrets claim must show "a substantial element of secrecy . . . so that, except by the use of improper means, there would be difficulty in acquiring the information." *Walker v. Univ. Books, Inc.*, 602 F.2d 859, 865 (9th Cir. 1979).  If a party shares information without the protection of a confidentiality agreement, it loses the ability to claim that information as a trade secret.  *HiRel Connectors, Inc. v. United States*, No. CV01-11069 DSF VBKX, 2006 WL 3618011, at *8 (C.D. Cal. Jan. 25, 2006).

Prostar's first asserted trade secret is for its system architecture.[11]  Pierson Decl. Ex. 53

---

[10] Domino's asserts that Prostar withdrew its only expert witness.  Reply 14.

[11] In full, the trade secret asserted is: "Prostar-designed system server/client module architecture for a delivery driver system that allows for integration with client business systems to access data with minimal impact on client internal systems, while allowing the client to communicate with drivers, access locations, estimate time of delivery, determine actual delivery and return, track distance driven, aide in compensation compliance, allow credit card payment processing at the door, provide customer notifications of eminent delivery, and increase deliver safety and security

(Prostar's trade secret disclosure) [Dkt. No. 72-53]. Domino's argues that it is not protectable because Prostar shared a diagram and other information about the system "widely and without protection," including in videos and as part of information shared with other companies.[12] MSJ 17–18. Prostar does not dispute that it shared this information but rather that it provided only a "superficial overview" rather than the "*customized* Domino's solution that had been developed *specifically* to work for Domino's franchisees and with Pulse."[13] Oppo. 26 (emphasis in original).

The parties dispute only the materiality of the information shared. The diagram shows the relationships and communication paths between different parts of an overall system, and it is not clear how much more the asserted trade secret—which does encompass algorithms or other technical information—could possibly encompass. Either way, summary judgment is appropriate because of Prostar's failure to show that any of its trade secrets, perhaps in particular this "system architecture," were actually secret at the time of their alleged misappropriation.

Domino's motion for summary judgment on the misappropriation of trade secrets claim is GRANTED.

### E.    Tortious Interference with Prospective Economic Relations

A plaintiff alleging tortious interference with prospective economic advantage must show:

> (1) the existence of a prospective business relationship containing the probability of future economic rewards for plaintiff; (2) knowledge by defendant of the existence of the relationship; (3) intentional acts by defendant designed to disrupt the relationship; (4) actual causation; and, (5) damages to plaintiff proximately caused by defendant's conduct.

*PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal. App. 4th 579, 595 (1996), disapproved of on other grounds in *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 n.11 (2003). And the claim requires that the defendant "engaged in an independently wrongful act." *Korea Supply*,

---

monitoring." Pierson Decl. Ex. 53.

[12] Domino's further points out that Prostar shared the conceptual design overview and the technical specifications of the Solution with Patxi's Pizza and On-The-Mark (an IT firm) without requiring them to sign nondisclosure agreements. *See* Olsen Depo. 201:3–203:6; Reply 16–17.

[13] In addition, Olsen promptly reached out to the accidental recipient of one email, who promptly deleted it. Oppo. 27.

29 Cal. 4th at 1159. The elements are the same for negligent interference although the plaintiff need only show that the defendant acted negligently. *See Venhaus v. Shultz*, 155 Cal. App. 4th 1072, 1078–89 (2007).

Domino's argues that Prostar's claims fail as a matter of law because there is no evidence that Domino's committed an independently wrongful act or that Prostar had an existing economic relationship with franchisees. MSJ 18–22. Prostar contends that Domino's engaged in an independently wrongful act when it committed fraud and Prostar had preexisting economic relationships with Domino's franchisees. Oppo. 24. Because there is insufficient evidence on both elements, Prostar's claim fails.

### 1. Wrongful Act

Because intentional interference with prospective economic advantage is not "a wrong in and of itself," a plaintiff must allege facts showing "that the defendant engaged in an independently wrongful act." *Korea Supply*, 29 Cal. 4th at 1158. Improper motive is not enough; rather, the act must be "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1159.

Prostar asserts that Domino's committed an independently wrongful act when it committed fraud. As I conclude below, Prostar's fraud claim fails.[14] *See infra* Section II.F – Deceit and Negligent Misrepresentation. Without this claim, Prostar fails to present evidence of an independently wrongful act.

### 1. Existing Economic Relationship

Domino's argues that Prostar asserts the mere hope for an economic relationship with the undifferentiated group of Domino's franchisees. MSJ 20–21. Conversations with interested franchisees do not constitute an existing economic relationship, and neither does their willingness

---

[14] Domino's asserts that the fraud claim cannot serve as an independently wrongful act for another reason: Olsen testified that "none of Domino's purported misrepresentations to Prostar interfered with the franchisee relationships." Reply 12; *see* Olsen Depo. 168:19–170:8. Rather, Domino's interfered when it failed to hold up its end of the bargain and allow Prostar to sell the Solution. *Id.* But "a breach of contract claim cannot be transmuted into tort liability by claiming that the breach interfered with the promisee's business." *JRS Prod., Inc. v. Matsushita Elec. Corp. of Am.*, 115 Cal. App. 4th 168, 183 (2004), *as modified on denial of reh'g* (Feb. 25, 2004). Prostar's claim would fail on these grounds as well.

to participate in the free pilot.[15]  Reply 13–14; MSJ 21.  In opposition, Prostar asserts that it "had developed relationships with dozens of franchisees representing thousands of locations through its presentations at Domino's trade shows and franchisee rallies."  Oppo. 22.  Together with IBM, which had "existing economic relationships with all, or nearly all, of Domino's franchisees," Prostar "generated significant interest from many franchisees, including those who were ready, willing, and able to implement the Solution."  *Id.* 23.

Because tortious interference claims cannot be based on speculation alone, the California Supreme Court requires that the plaintiff "prove a business relationship with a specific third party containing 'the probability of future economic benefit to the plaintiff.'"  *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 980 (N.D. Cal. 2013) (Illston, J.) (quoting *Youst v. Longo*, 43 Cal.3d 64, 71 (1987)).  To show an economic relationship, "the cases generally agree that it must be reasonably probable the prospective economic advantage would have been realized but for defendant's interference."  *Youst v. Longo,* 43 Cal. 3d 64, 71 (1987).  "Allegations that amount to a mere hope for an economic relationship and a desire for future benefit are inadequate to satisfy the pleading requirements of the first element of the tort."  *Id.* (internal quotation marks and citations omitted).

In one case, the court granted summary judgment because the plaintiff's "'interference with the market' theory" was insufficient to show "an economic relationship with a prospective buyer which was reasonably likely to produce a future beneficial sale of its property."  *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 528 (1996).  The plaintiff argued that the defendant had interfered with its relationship with "the entire market of all possible but as yet unidentified buyers."  *Id.* at 527.  The court found that liability was foreclosed as a matter of law because the plaintiff relied on no more than a hypothetical offer from a hypothetical buyer.  *Id.*; *see also Lowell v. Mother's Cake & Cookie Co.*, 79 Cal. App. 3d 13, 19, 144 Cal. Rptr. 664 (Ct. App. 1978) (reversing dismissal where the plaintiff pleaded that the defendant had intentionally interfered with actual offers from potential purchasers); *AdTrader, Inc. v. Google*

---

[15] Eight franchisees tested the Solution for free.

*LLC*, No. 17-CV-07082-BLF, 2018 WL 3428525, at *6 (N.D. Cal. July 13, 2018) (dismissing a complaint that "merely lump[ed] allegations regarding more than two hunderd [sic] web publishers without pleading factual allegations as to the specific relationship between [the plaintiff] and each publisher"); *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 243 (2005) (granting summary judgment because conversations about the possibility of a buy-out were insufficient to show an existing relationship or a "*probability* of future economic benefit").

Prostar's claims fail because there is insufficient evidence to allow a reasonable fact finder to conclude that Prostar had existing economic relationships with the franchisees or the probability of future benefit. Presentations at trade shows and expressions of interest are insufficient to create an economic relationship. Although Prostar argues that the market here is "finite and specifically identifiable"—namely, Domino's franchisees—it cannot lump together allegations regarding the undifferentiated group of 11,000 Domino's stores worldwide or its 5,000 domestic stores. *See* Oppo. 24; *AdTrader, Inc. v. Google LLC*, 2018 WL 3428525, at *6. In addition, it cannot rely on *IBM's* prior relationships with franchisees. For the eight franchisees who did in fact receive proposed contracts about the Solution—two of which were signed—Prostar cannot overcome two key flaws. First, the contracts were between the franchisees and IBM, not Prostar. Exs. 49, 50, 51, 52. Second, a willingness to test a free product does not create a probability that the relationship will later produce an economic benefit.[16]

Without triable issues on these elements, Prostar's claims cannot proceed to a jury. Domino's motion for summary judgment on the tortious interference claims is GRANTED.

### F. Deceit and Negligent Misrepresentation

Domino's argues that Prostar's claims fail because there is no evidence of Domino's intent, statements it made were too vague to form the basis of the claims, and Prostar cannot show justifiable reliance. MSJ 22–26.

To succeed on its fraud claims, Prostar must prove: "(1) misrepresentation (false

---

[16] When asked, "And so is it fair to say you don't know ultimately whether [franchisee Charles Bell] would have agreed down the line to buy driver tracking either?" Maertens of IBM testified, "I don't know." Maertens Depo. 291:25–292:4. Many franchisees decided not to go ahead even with the free test. *See id.* 281:18–285:6.

23

representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995) (internal quotation marks and citation omitted). To succeed on its negligent misrepresentation claim, Prostar must prove: "(1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (5) damages." *Fox v. Pollack*, 181 Cal. App. 3d 954, 962 (1986).

Domino's first challenges the sufficiency of evidence showing that it had the intent to deceive. Plaintiffs cannot rely on a claim of fraud as an alternative to a contract claim absent evidence that the defendant intended "at the time of the promise not to perform it." *Water, Inc. v. Everpure, Inc.*, No. CV 09-3389 ABC (SSX), 2011 WL 13174224, at *15 (C.D. Cal. Dec. 19, 2011) (emphasis in original) (quoting *Building Permit Consultants, Inc. v. Mazur*, 122 Cal. App. 4th 1400, 1414 (2004); *see Conrad v. Bank of Am.*, 45 Cal. App. 4th 133, 156–57, 53 Cal. Rptr. 2d 336 (1996) ("[A] claim of fraud cannot be permitted to serve simply as an alternative cause of action whenever an enforceable contract is not formed."). When a party makes a promise in good faith and with the "honest expectation that it will be fulfilled," that promise cannot form the basis for a promissory fraud claim. *Water*, 2011 WL 13174224, at *15.

Prostar has not presented sufficient evidence for a reasonable fact finder to conclude that Domino's intended to deceive it at the time of the asserted statements. In opposition, Prostar relies entirely on Domino's denial of a contractual relationship to show that the statements were made "with the obvious intent" to deceive. Oppo. 20. Prostar writes,

> [I]f Domino's had no intent to defraud at the time these statements were made, then the parties had a contractual relationship. If a contractual relationship is denied, it is because Domino's never meant what it said. These specific, clear statements cannot be characterized, then or now, as innocent misunderstandings.

Oppo. 21. This circular logic will not fly. Domino's mere denial or nonperformance of its promises to Prostar cannot serve to establish that it "never meant what it said." As Domino's points out, Olsen himself testified to his belief that Domino's had acted in good faith. Olsen

Depo. 172:22–173:6 (answering in the affirmative when asked whether he believed that Domino's had made the asserted promises in good faith); *see* MSJ 23. There is insufficient evidence to create a triable issue regarding Domino's intent.

Domino's further argues that Prostar cannot show that it justifiably relied on the asserted statements, which are too vague to form the basis for Prostar's claims. MSJ 24–25. A plaintiff must show actual reliance and that the reliance was reasonable. Reliance is reasonable if (1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act . . . and (2) it was reasonable for the plaintiff to have relied on the misrepresentation." *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1194, 175 Cal. Rptr. 3d 820, 833 (2014), *as modified on denial of reh'g* (Aug. 13, 2014). If a plaintiff has particular knowledge or skill, that factors into the analysis. *Id.* In one case, a defendant told the plaintiff neighbor he would "take care of" the problem of vehicles crossing the property line. *Id.* The plaintiff's reliance on the statement was not reasonable because he subsequently observed, without complaint, many vehicles continuing to cross the property line. *Id.*

Prostar argues that far from being vague, these statements "unequivocally communicated support and ratification of Prostar's efforts on behalf of Domino's" and show Domino's "commitment to developing the Solution." Oppo. 20. I disagree. Most importantly, Domino's made these statements in the context of the parties' attempt to roll out a *pilot* of the Solution. Reply 12. They certainly indicate Domino's present interest and commitment to the development of the tool, but Domino's also made other statements indicating its inability to commit fully. A reasonable fact finder could not conclude that Prostar reasonably relied on them to signify that Domino's planned to fully adopt, purchase, and mandate that franchisees purchase the as-yet unfinished solution.

### G. Promissory Estoppel

"The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Jones v. Wachovia Bank*, 179 Cal. Rptr. 3d 21, 28 (2014). Domino's argues that

United States District Court
Northern District of California

summary judgment is appropriate on Prostar's promissory estoppel claim because it cannot show that Domino's made a promise in clear and unambiguous terms or that Prostar reasonably relied on any such promise.

In one case, the court concluded that a bank's promise that plaintiff would receive a loan modification could not give rise to a promissory estoppel claim because it was missing essential terms, such as "payment schedules for each loan, identification of the security, prepayment conditions, terms for interest calculations, loan disbursement procedures, and rights and remedies of the parties in case of default." *White v. J.P. Morgan Chase, Inc.*, 167 F. Supp. 3d 1108, 1113 (E.D. Cal. 2016). In another case, a court in this district dismissed a claim where the plaintiff "merely allege[d] that [the defendant] promised to provide substantial quantities of future business." *B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C 07-02864 JSW, 2007 WL 3232276, at *6 (N.D. Cal. Nov. 1, 2007); *see also Snider v. Roadway Packaging Sys.*, No. C-99-02728 CRB, 2000 WL 375234, at *7 (N.D. Cal. Apr. 11, 2000) (granting summary judgment where the plaintiff "failed to establish that defendant made any definite promises").

Domino's statements were not sufficiently "clear and unambiguous" to sustain a valid promissory estoppel claim because they were devoid of necessary and essential terms—or any terms at all. *See White*, 167 F. Supp. 3d at 1113. Prostar asserts that Domino's said it was "interested in GPS," that it would "mandate that every driver be tracked" if the tests were successful, and that Prostar had its "full support." Oppo. 15. Prostar writes in opposition, "The promises at issue in this case boil down to this: complete the work to make Prostar's product work with Domino's systems, and you will be able to sell it to franchisees." *Id.* But different people made these ambiguous statements at different points in time, including early in the development of the Solution. It is not clear what Domino's "full support" meant, what a successful Solution would look like, or what terms the parties would use in selling it to franchisees. *Cf. Clay v. Koch*, No. C 95-1289-FMS, 1996 WL 417241, at *3 (N.D. Cal. July 22, 1996) (finding a statement of being "committed" too vague to support a fraud claim). At best these statements are no more than "promise[s] to provide substantial quantities of future business." *B & O Mfg.*, 2007 WL 3232276, at *6.

Even if these statements could show a clear and unambiguous promise, Prostar has failed to demonstrate that its reliance was reasonable because of other statements by Domino's that cast doubt on its level of commitment. *See Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (concluding that because the promise was neither specific nor clear, "any reliance on it . . . was unreasonable and unforeseeable"). Because a reasonable fact finder could not conclude that Prostar reasonably relied on a clear and unambiguous promise, summary judgment is GRANTED on the promissory estoppel claim.

### H. Unfair Competition

Prostar's claim for unfair competition rests on its fraud claims. *See* FAC ¶ 189; Oppo. 22. I concluded that summary judgment is appropriate on Prostar's fraud claim, *see supra* Section II.F – Deceit and Negligent Misrepresentation. Accordingly, Domino's is also entitled to summary judgment; its motion is GRANTED with respect to the unfair competition claim.

### III. LOST PROFITS

Domino's argues that it is entitled to summary judgment on Prostar's claim of $170 million in lost profits because as a new business, Prostar cannot calculate anticipated profits with any degree of certainty. MSJ 28–30. Prostar counters that it is entitled to damages based on a reasonable estimate of the profits it would have earned from selling the Solution to Domino's franchisees. Oppo. 28–30.

In California, an unestablished business generally cannot recover damages for anticipated future profits because "their occurrence is uncertain, contingent and speculative." *Grupe v. Glick*, 26 Cal. 2d 680, 693 (1945). However, "anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability." *Id.* Such reasonable reliability can be established through evidence including "expert testimony, economic and financial data, market surveys and analysis, business records of similar enterprises and the like." *Sargon Enterprises, Inc. v. Univ. of S. California*, 55 Cal. 4th 747, 776 (2012); *see also Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 885 (2002) (internal quotation and citation omitted) (noting a party can rely on the experience of a similar business in the industry if there is a "substantial and sufficient factual basis" for the calculation).

In *Kids' Universe*, a California court of appeal concluded that the trial court correctly granted summary judgment on the question of lost profits because there was insufficient evidence to show "*to a reasonable certainty* that the unestablished business would have made a *profit*." *Kids' Universe*, 95 Cal. App. 4th at 887–88 (emphasis in original). The defendants had caused flooding in the plaintiffs' retail store, and among other things, plaintiffs sought to recover lost profits for their inability to launch a new website at the start of the holiday shopping season. *Id.* at 874–75. The court of appeal determined that the evidence was too speculative to allow a fact finder to conclude to a reasonable certainty that plaintiffs would have made a profit from the retail website, which was an entirely new venture. *Id.* at 887. The plaintiffs "presented no specific economic or financial data, market survey, or analysis based on the business records or operating histories of similar enterprises" to allow a reasonably certain calculation of lost profits. *Id.* at 888.

Prostar can establish with reasonable certainty neither the occurrence nor the extent of the profits it asserts. *See Grupe*, 26 Cal. 2d at 693. First, it cannot show with reasonable certainty that it would have earned profits from any specific number of franchisees. Expressions of interest from some franchisees does not show Prostar would have struck an eventual deal with any of them, especially given that the Solution was still in development. *See* Oppo. 29; *Sargon*, 55 Cal. 4th 747, 781 (2012) (noting the absence of a "logical basis to infer that Sargon *would* have achieved that market share"). In addition, there is no telling the extent of its lost profits from this evidence. Prostar's expert relied on "no specific economic or financial data, market survey, or analysis based on the business records or operating histories of similar enterprises." *See Kids' Universe*, 95 Cal. App. 4th at 888; Deposition of Jeffrey Redman ("Redman Depo.") [Dkt. No. 72-63] 48:6–25, 75:6–77:23. Because the future profits Prostar asserts are no more than "uncertain, contingent and speculative," *see Grupe*, 26 Cal. 2d at 693, Domino's motion for summary judgment on claims for lost profits is GRANTED.

## IV.    MOTIONS TO SEAL

A party seeking to seal court records must overcome a strong presumption in favor of the public's right to access those records. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir.), *cert. denied sub nom. FCA U.S. LLC v. Ctr. for Auto Safety*, 137 S. Ct. 38

(2016).  The Ninth Circuit imposes the "compelling reasons" standard on most motions to seal, which requires a court to explain its findings "without relying on hypothesis or conjecture."  *Ctr. for Auto Safety*, 809 F.3d at 1096–97.  A "good cause" exception applies to some nondispositive motions, including those related to discovery.  *Ctr. for Auto Safety*, 809 F.3d at 1097.  Nondispositive motions that are "more than tangentially related to the merits of a case" remain subject to the compelling reasons standard.  *Id.* at 1101.

The parties' motions to seal are overbroad and insufficiently justified.  Requests must be "narrowly tailored to seek sealing only of sealable material."  Civ. L.R. 79-5(b).  The parties here seek to seal the entirety of deposition excerpts.[17]  *See, e.g.*, Pierson Decl. ¶ 15.  Further, "[r]eference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable."  Civ. L.R. 79-5(d)(1)(A).  The mere fact that information is nonpublic or designated as confidential does not justify sealing, especially at the summary judgment stage.  *See, e.g.*, Pierson Decl. ¶¶ 9, 10, 11, 13; Nash Decl. ¶¶ 8–9.  Finally, the parties failed to provide compelling justifications for sealing, for example, marketing plans that are several years old and broad descriptions of technology that has surely changed.  *See* Pierson Decl. ¶¶ 12, 14, 16.

As the motions stand, I see compelling justifications to seal only Prostar's trade secret disclosures and substantially related email correspondence.  *See* Dkt. Nos. 72-53; 76-43; 76-44; Nash Decl. ¶¶ 10–11.  If the parties believe additional material meets this high bar, they may file amendments to their motions that comply with the Local Rules and my Standing Order on Motions to Seal.  If they fail to file such amendments within fourteen (14) days of the date of this Order, the motions will be granted only with respect to docket numbers 72-53, 76-43, and 76-44.

---

[17] The quotes redacted in briefs demonstrate the breadth of the parties' requests.  For example, there are not compelling justifications to seal the following sentence:  "Prostar admits the proposal was to get the 'ideas flowing' about product and pricing."  *See* MSJ 29.

United States District Court
Northern District of California

**CONCLUSION**

For the reasons set forth above, Domino's motion for summary judgment is GRANTED in full.  Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: December 28, 2018



William H. Orrick
United States District Judge